**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

AHMED SALEM BIN ALI JABER, personal
representative of the estate of SALEM BIN ALI
JABER, by his Next Friend FAISAL BIN ALI
JABER,
c/o Reprieve US
405 Lexington Avenue
62nd Floor
New York, NY  10174

and

ESAM ABDULLAH ABDULMAHMOUD BIN
ALI JABER, personal representative of the estate
of WALEED BIN ALI JABER, by his Next Friend
FAISAL BIN ALI JABER,;
c/o Reprieve US
405 Lexington Avenue
62nd Floor
New York, NY  10174

*PLAINTIFFS,*

*v.*

THE UNITED STATES OF AMERICA,

BARACK OBAMA,
The President,
The White House
1600 Pennsylvania Avenue, N.W.
Washington, D.C.  20500

LEON PANETTA,
Former Secretary of Defense,
15 Panetta Road
Carmel Valley, CA  93924-9452

DAVID PETRAEUS,
Former Director, Central Intelligence Agency,
P.O. Box 7184
Arlington, VA  22207

Civil Action No. 1:15-cv-840

**COMPLAINT**

UNKNOWN DEFENDANT ONE,
a person employed by or under the authority of the
United States,


UNKNOWN DEFENDANT TWO,
a person employed by or under the authority of the
United States,

and

UNKNOWN DEFENDANT THREE,
a person employed by or under the authority of the
United States,

*DEFENDANTS.*

## INTRODUCTION

1.      On August 29, 2012, Hellfire missiles fired from a United States drone struck

near the local mosque in Khashamir, a small village in the Hadhramaut Governorate in eastern

Yemen.  The August 29th strike killed two innocent members of a prominent local family, Salem

bin Ali Jaber and Waleed bin Ali Jaber[1]; it also violated the laws of war and norms of customary

international law.  By this complaint, the estates of Salem and Waleed seek to hold accountable

those responsible for their wrongful deaths.[2]

2.      The wrongful killings of Salem and Waleed have been well documented in the

media and in professional studies of the U.S. drone program.  The circumstances and aftermath

of their deaths provide a case study of the failures of the drone war—intelligence limitations and

---

[1]For simplicity, they will be referred to from here on as Salem and Waleed.   Other members of
the bin Ali Jaber family will be so referenced after initial introduction.

[2]This complaint describes the lives of Salem and Waleed, the innocent victims of the strike.  It
also describes village life in Khashamir, the strike itself and its aftermath.  Except where
expressly qualified, plaintiffs plead these facts from personal knowledge.  Other allegations in
the complaint—how the U.S. operates its secretive drone program, the roles of individuals, and
so on—are necessarily pled on information and belief.  For clarity, many of those allegations are
accompanied by references to sources of underlying information.

inaccuracies, innocents killed, communities terrorized and a near-total vacuum of Executive

Branch accountability.  These failures live on in the hearts and minds of survivors and witnesses

long after U.S. authorities have moved on to the next target.

3.  These lethal wrongs are also avoidable by those responsible for the drone

program, including the President of the United States.  When U.S. officials choose not to correct

mistakes—or as here even to acknowledge them—they are responsible not only for innocent

deaths, but also for undermining rather than protecting U.S. national security.

## SUMMARY OF CASE

4.  U.S. drone attacks are authorized and supervised in Washington, D.C. by, among

others, the President, the Secretary of Defense and the Director of the Central Intelligence

Agency ("CIA"), by their admission.

5.  The United States conducts some lethal drone strikes on active battlefields.  It has

also carried out many strikes in other areas, such as in remote areas of the Republic of Yemen,

where no U.S. soldiers are deployed and where there is no war.

6.  Sometimes, U.S. drones target specific individuals the U.S. government has

deemed a threat.  Many times, however, U.S. personnel conduct so-called "signature strikes", in

which the drones attack and kill people whose identities the United States does not know.

Signature strike targets are selected based on a cocktail of data – largely signals intelligence –

such as an unidentified person's cell phone usage, travel patterns and believed associates.  U.S.

drone personnel describe this amalgam of data as a "signature," which they then use to determine

whether to kill a given person.

7.  The August 29th strike was such a signature strike, organized, evaluated and

carried out remotely by U.S. personnel in the United States.  The attack team sitting in the United

States reviewed drone-transmitted video and other strike-related information, and beamed missile-launch commands to the drone in Yemeni airspace.

8.      Neither Salem nor Waleed were the likely targets of the strike that killed them. Salem was an imam known locally for his sermons against terrorist violence.  Just a few days before his death, he had preached in Khashamir against al Qaeda  and its methods.  Faisal's nephew Waleed was the village's local traffic policeman, who accompanied Salem as protection to an evening meeting with three youths who had driven into the village earlier in the day and had asked to meet with Salem.  These three young men were the apparent targets of the drone strike.

9.      It is far from clear that even those three were valid or sensible targets.  Post-strike photographs, though grisly, suggest that at least one of the men was very young.  Though they have never been identified by name, plaintiffs are informed and believe that none were high-level, high-value targets to the United States.

10.      In the unlikely event the three youths were acceptable targets, it would have been feasible either to arrest them, or to target them without killing Salem and Waleed.  The three had loitered alone for a significant period before meeting with Salem and Waleed.  None were local villagers, so the group had to drive for a significant distance outside populated areas in order to reach Khashamir.  There is no moral or legal rationale that justifies U.S. drone operators waiting to strike until *after* Salem and Waleed joined the three visitors.

11.      While the drone operators fixed on the visitors as their principal targets, Salem and Waleed were anonymously—but deliberately—attacked simply for having spoken to them.

12.      Khashamir was far away from any battlefield.  No urgent military purpose or other emergency justified the strike that exterminated Salem and Waleed.  The strike plainly

violated the Torture Victim Prevention Act's ban on extrajudicial killings.  Even if the strikes were taken as part of the United States' war on al Qaeda, the strike violated the principles of distinction and proportionality.  These are established norms of the laws of war, which are elements of customary international law that the United States explicitly acknowledges bind this country and apply to its drone warfare operations.

13.     Within hours of the strike, it became clear to the bereaved family that government officials knew they had made a mistake.  That evening one Yemeni official spoke by telephone with several family members, including Next Friend Faisal bin Ali Jaber, Salem's brother-in-law.  The official conveyed personal condolences for the wrongful deaths of Salem and Waleed, but offered no official acknowledgement of or redress for the strike.

14.     The August 29th strike shook the region.  The deaths of two fathers, respected community members, shocked and angered residents.  After the attack, hundreds of citizens from the region where the bin Ali Jaber family lives took to the streets to protest this slaughter of innocents.  They were met with official indifference.

15.     Meanwhile, Faisal and other notables from Khashamir formed a committee to advocate with Yemeni officials for justice.  They asked that the governments of the United States and Yemen admit responsibility for the strike and the innocence of Salem and Waleed, as well as compensation for their deaths.  Again, no official acknowledgement was forthcoming.

16.     By late 2013, stymied by official silence in Yemen, Faisal traveled to the United States (after requesting and being granted a 12-month multiple entry visa).  In Washington, DC, he discussed the attack with Congressmen, Senators, and representatives of the President's National Security Council.

17.     Behind closed doors, American officials offered personal condolences for the bin Ali Jaber family's losses.  But they could not or would not explain the reason for the attack, or acknowledge officially that a U.S. drone killed Faisal's relatives.  To do that would be to admit that the United States needlessly killed a man—Salem—who wasn't just innocent of involvement in terrorism but who vigorously opposed al Qaeda.

18.     Salem's killing effectively overwhelmed his anti-radicalization message.  It convinced many in the local communities that the United States does not distinguish friend from foe, and is credited with driving disaffected local young men to militant groups.

19.     That outcome is in line with what a study co-authored by an advisor to the U.S. Joint Chiefs described as "[a] growing body of research…show[ing] that civilian casualties (CIVCAS) and the mishandling of the aftermath can compel more people to work against U.S. interests."  Lewis & Holewinski, *Changing of the Guard: Civilian Protection for an Evolving Military,* PRISM 4, no. 2, p. 57, July 2013.

20.     Rarely but occasionally, the U.S. government addresses the reality that its drones kill innocents, and expresses official regret.  Only weeks ago the President addressed the nation about two other innocents killed by a U.S. drone: an Italian citizen and an American, who were mistakenly hit in a drone strike in Pakistan while being held hostage by al Qaeda.  In his televised statement, the President explained that "the [victims'] families deserve to know the truth," and claimed that his apology showed the U.S. is willing "to confront squarely our imperfections and to learn from our mistakes."

21.     There is a simple question at the heart of this claim.  The President has now admitted to killing innocent Americans and Italians with drones; why are the bereaved families of innocent Yemenis less entitled to the truth?

22.    Salem and Waleed were wrongfully killed by United States personnel who performed their lethal acts in the United States.  Having exhausted all alternatives, the estates of Salem and Waleed seek justice from this Court, including a determination that the strike that killed Salem and Waleed was unlawful, and any other relief that the interests of justice require.

## JURISDICTION AND VENUE

23.    Plaintiffs are citizens of Yemen who seek declaratory and other relief against citizens of the United States for tortious acts committed within the United States in violation of customary international law and the Torture Victim Protection Act of 1991, Pub.L. 102-256, 106 Stat. 73 (1992).

24.    This Court has jurisdiction under 28 U.S.C. §1350 (the Alien Tort Statute), 28 U.S.C. §2201 (the Declaratory Judgment Act), and 28 U.S.C. §1331 (federal question jurisdiction).

25.    Venue is proper under 28 U.S.C. § 1391(e)(1) because the defendants are officers or employees of the United States or agencies thereof who acted in their official capacities, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district.

## PARTIES

26.    Ahmed Salem bin Ali Jaber (hereinafter "Ahmed") was Salem's father.  Pursuant to Yemeni law and custom, he is the personal representative of Salem's estate.  Esam Abdullah Abdulmahmoud bin Ali Jaber (hereinafter "Esam") is the personal representative of the estate of Waleed.  In the nearly three years since the fatal strike, they have pursued information, redress and justice for the estates and families of Salem and Waleed.

27.     Ahmed is responsible for the financial and personal security of Salem's surviving family members as well as his own.  He lives and works in Khashamir.  He has very limited financial resources.  His family, financial and employment circumstances make it impossible as a practical matter for him to travel to the United States to initiate or supervise this lawsuit.  These practical difficulties are currently compounded by the volatile political conditions in Yemen, which render travel within and from Yemen dangerous.

28.     At the time of his death, Salem was a citizen of Yemen who lived in Mukalla, a port town on the Gulf of Aden and the capital of Hadhramaut.  Salem was born in Khashamir in 1969 and studied at elementary school there.  Salem's family is also native to Khashamir village.  He had a master's degree in linguistics from the Hadhramaut University of Science and Technology, taught languages at the local secondary school, and served his community as an imam.  He had a large family and left a widow and seven children:

> Mohammed – 19 years old (M)
> Ahmed – 6 years old (M)
> Abdullah – 2 years old (M)
> Muznah – 17 years old (F)
> Shaimaa – 7 years old (F)
> Omaimah – 12 years old (F)
> Khadijah – 11 years old (F)

29.     Esam was Waleed's brother.  Under Yemeni law and custom he is the personal representative of Waleed's estate and has authority to act for and on behalf of the estate, including the authority to authorize, initiate and supervise this action.

30.     Esam is responsible for the financial and personal security of Waleed's surviving family members as well as his own.  He lives and works in Khashamir.  He has very limited financial resources.  His family, financial and employment circumstances make it impossible as a practical matter for him to travel to the United States to initiate or supervise this lawsuit in

person.  These practical difficulties are currently compounded by the volatile political conditions in Yemen, which render travel within and from Yemen dangerous.

31.     At the time of his death, Waleed was a 26-year old citizen of Yemen.  He lived in Khashamir where he served as one of the village's two policemen and is survived by his wife, infant child and elderly mother for whom he cared.

32.     Faisal is a citizen of Yemen.  He was born and raised in Khashamir, and has spent much of his adult life working in Sana'a, Yemen's capital, hailing originally from Khashamir. He holds a masters' degree in engineering and until recently was an official with Yemen's Ministry of Environment.  He has travelled to the Netherlands, Germany, and the United States to speak about the drone program and the devastation it has wreaked on the lives of Yemenis, and to seek redress and justice for the estates and families of Salem and Waleed.

33.     Shortly after the strike, Faisal became a member of a committee of community notables established by the victims' immediate families to represent their interests.  The families asked committee members to pursue justice and compensation with government officials.

34.     At present the personal circumstances of Ahmad and Esam disable them from personally initiating or conducting legal proceedings in the United States for the estates and families of Salem and Waleed.  Reposing full trust and confidence in Faisal, and recognizing that his personal circumstances enable him to do so, they have asked him to use his best efforts to pursue such legal proceedings.  To that end, as the representatives of the estates of Salem and Waleed, Ahmed and Esam have each given Faisal a power of attorney authorizing him to initiate and supervise this lawsuit as their next friend.  Faisal was Salem's brother-in-law and Waleed's uncle.  He has no financial interest in the outcome of this case and seeks to act as next friend solely to seek justice for the estates of Salem and Waleed and the bin Ali Jaber family.

35.     Defendant The United States of America plans, authorizes and carries out lethal drone strikes within the territory of the Republic of Yemen and elsewhere.  It does so through facilities and personnel located within the District of Columbia and elsewhere in the continental United States.  Such strikes include signature strikes—such as the August 29th strike that killed Salem and Waleed—that violate applicable U.S. and international law, including the obligation to refrain from extrajudicial killing, and the principles of distinction and proportionality.

36.     Defendant Barack Obama is the President of the United States.  He is commander-in-chief of U.S. armed forces and the person to whom U.S. intelligence services, including the CIA, are answerable.  Within the District of Columbia and elsewhere in the United States, he holds and personally exercises supervisory authority over U.S. drone policy and drone strikes.  He is named as a defendant because he:  (1) personally authorized the use of so-called "signature strikes"; and (2) persistently and deliberately failed to take care that signature strikes would comply with applicable U.S. and international law, including the obligation to refrain from arbitrary extrajudicial killing, and the principles of distinction and proportionality.

37.     Defendant Leon Panetta was the Secretary of Defense at the time of the August 29th strike.  As Secretary of Defense he held and exercised command responsibility for the conduct of U.S. armed forces worldwide, including U.S. Joint Special Operations Command (JSOC), whose personnel, in cooperation with personnel from the Central Intelligence Agency ("CIA"), implement Defendant United States' program of lethal drone missile strikes in Yemen and elsewhere.  Among other things, Defense Department personnel assist in targeting drone victims and actually implement the missile launch commands.  With Defendant Obama, Defendant Panetta evaluated and authorized the use of signature strikes within Yemen, including the August 29th strike, and persistently and deliberately failed to take care that such signature

strikes would comply with applicable requirements of U.S. and international law, including the obligation to refrain from arbitrary extrajudicial killing, and the principles of distinction and proportionality.

38.     Defendant David Petraeus was the Director of the CIA at the time of the August 29th strike.  As CIA Director, he personally exercised supervisory control over the CIA's lethal drone operations in Yemen and elsewhere and the activities of CIA personnel in conducting and assisting the Defense Department in conducting drone strikes.  With Defendants Obama and Panetta, Defendant Petraeus evaluated and authorized the use of signature strikes within Yemen, including the August 29th strike, and persistently and deliberately failed to take care that such signature strikes would comply with applicable requirements of U.S. and international law, including the obligation to refrain from arbitrary extrajudicial killing, and the principles of distinction and proportionality.

39.     Unknown Defendant Number One is a person employed by or under the authority of the United States:

     a.   whose name, due to government secrecy practices, is presently unknown;

     b.   whose job function at the time was part of either JSOC or the CIA;

     c.   whose job function at the time included evaluating the drone-produced and other intelligence data relating to the August 29th strike in order to recommend to the person with final command authority whether and when a strike should occur; and

     d.   who, after reviewing the circumstances actually existing at the strike venue, including the fact that two unknown persons (Salem and Waleed) had joined the three youths already under surveillance, recommended that that the person with final command authority launch the August 29th strike.

40.     Unknown Defendant Number Two is a person employed by or under the authority of the United States:

    a.   whose name, due to government secrecy practices, is presently unknown,

    b.   whose job function at the time was part of either JSOC or the CIA;

    c.   whose job function at the time included evaluating the drone-produced and other intelligence data relating to the August 29th strike in order to recommend to the person with final command authority whether and when a strike should occur; and

    d.   who, after reviewing the circumstances actually existing at the strike venue, including the fact that two unknown persons (Salem and Waleed) had joined the three youths already under surveillance, recommended that that the person with final command authority launch the August 29th strike.

41.     Unknown Defendant Number Three is a person employed by or under the authority the United States:

    a.   whose name, due to government secrecy practices, is presently unknown;

    b.   whose job function at the time was part of either JSOC or the CIA; and

    c.   who, knowing the circumstances actually existing at the strike venue, including the fact that two unknown persons (Salem and Waleed) had joined the three youths already under surveillance, exercised final command authority to order the launch of the August 29th strike.

### STATEMENT OF FACTS

42.     Before a U.S. drone fired on its residents, Khashamir was a quiet village in a sparsely populated part of Eastern Yemen.  The village was spared much of the violence that

plagued other parts of Yemen during the country's 2011 revolution, which ousted a longstanding dictator.

43.     In part this is because there weren't many people to fight with, and not much to fight over:  Khashamir had about three thousand inhabitants, many of whom were part of Faisal's extended family.  It had a handful of shops, a mosque and crime was virtually non-existent. Khashamir had just two policemen.  One was Salem's and Faisal's nephew Waleed.

## THE SERMON

44.     The week before the strike, Khashamir was unusually full of activity with Eid Ramadan and preparations for the August 28th hometown wedding of Faisal's eldest son, Wahb. Yemeni wedding celebrations are elaborate and can extend for a week or more.  The extended family of bin Ali Jabers converged on the village.  Faisal had planned a full week of celebrations, and was in Khashamir before the wedding arranging elaborate entertainment and meals.

45.     On August 24th, the Friday before the wedding, there was also a special event:  a guest sermon in the local mosque by Salem.  At the time Salem lived in Mukalla, a port town and the capital of Hadhramaut.  A preacher with a master's degree, Salem had spearheaded an education initiative in Mukalla for children and teenagers.  The initiative, done jointly with several other local imams, sought to teach children a moderate and tolerant Islam, and to counter extremist ideology that violent groups like al Qaeda espouse.

46.     Khashamir residents and nearby townspeople gathered in the mosque to hear Salem speak.  Faisal was present and recalls the sermon vividly.

47.     Salem's topic was "killing outside of law."  He described how he and his fellow imams had closely studied the ideology of their al Qaeda opponents and specifically challenged al Qaeda to justify its attacks on civilians.  He flatly rejected the group's theological excuses for

terrorism, preaching, as Faisal recalls it: "al Qaeda say that Abdo Rabo Mansour Hadi [Yemen's president] is *kafir* [a disbeliever] because he supports foreigners, and that people who support AbdoRabo [including Yemenis] are *kuffaar* [disbelievers] and can be attacked. This is not permissible in Islam. No religion, no constitution can ever accept this. I challenge al Qaeda to show me one piece of evidence in Islam that says such killing is justified."

48. As stirring and dramatic as the sermon was, it also concerned some in the bin Ali Jaber family, who worried Salem's words would reach the ears of people who would be displeased. Salem's father told Faisal he was concerned that his son might invite reprisals and endanger the family. He asked Faisal to raise these concerns with Salem.

49. On Tuesday August 28th, the day of the wedding, Faisal took Salem aside and suggested that he might tone down his preaching. Salem refused, saying in effect "I am an imam. If I, a leader in my community, do not take it on myself to speak against extremism, who will?"

50. The wedding of Faisal's son occurred later that day and was a joyous family and village celebration.

**THE STRIKE**

51. In the early afternoon of August 29th, three young men in an unfamiliar automobile drove into Khashamir. The men, all unknown to local villagers, were reportedly driving an old 1980s model Suzuki Vitara 4x4. As they entered the village, they asked for Salem's father's house, and when pointed there, approached and requested to speak to Salem. Fearful their visit had to do with Salem's sermon four days earlier, Salem's father, plaintiff Ahmed, told them Salem was visiting neighboring villages. They left, but said they would return later. The visitors then reportedly drove out of the village.

52.     The three men returned around 5 PM the same day.  Ahmed told them Salem had not yet returned.  He said they could either wait there in his house or return in the evening when they would find Salem at the mosque after evening prayers.  The visitors drove away a second time, choosing again to return to the village later.

53.     After sundown, around 8:30 pm, the visitors returned.  They drove up next to the mosque, parked in the dark, and waited.  After night prayers, Salem left the mosque with some of the local worshipers and started towards his father's home.  The visitors sent a local child to ask Salem to return to meet them.

54.     These were odd circumstances and observers recall that Salem hesitated, wondering aloud if he should be concerned about the three and what they wanted with him.  At that point, Waleed happened by and offered to accompany Salem, reportedly saying all would be well if a police officer was around.  Reassured, Salem decided to meet the young men in Waleed's company.  By this time it was around 9 pm.  Other people from the congregation observed from a distance as the meeting came together in case something went wrong.

55.     Two of the men sat down with Salem under a palm tree near their parked car, while the third remained a short distance away, watching the meeting.

56.     Suddenly, without warning, the first missile struck.

57.     Faisal was nearby having dinner with relatives, including some small children.  They heard the buzzing of the drone, and then heard and saw the orange and yellow flash of a tremendous explosion.  The children began to panic.

58.     At short intervals, second and third and fourth missiles struck the meeting area.

59.     According to eyewitnesses, the first two strikes directly hit Salem, Waleed and two of the three strangers.  The third missile seemed to have been aimed at where the third

visitor was located, somewhat apart from the others.  It reportedly hit him as he lay dazed or wounded after the first two strikes.  The fourth strike hit the car.

60.     The strike hit very near villagers' houses and damaged a number of properties. The windows of the mosque were blown out and the roofs of houses blown off.

61.     The bodies of all five men were blown apart.  Salem and Waleed could be identified only by people who knew them well and could recognize body parts—such as distinctive hair on portions of the heads of Salem and Waleed found in the blast area.

62.     Several hours after the strike, Faisal spoke by telephone with someone who introduced himself as "Mohammed," a representative of Yemen's security services.  He apparently was calling to apologize that "Salem and Waleed were not the targets."  Faisal responded that an anonymous call with a member of the security services was of no use or value and demanded some form of justice, including a public apology.  "Mohammed" demurred, saying for that Faisal would have to contact the President of Yemen.  Faisal did that immediately and in later follow-up calls, to no avail.  No official acknowledgement was forthcoming.

63.     Yemeni security personnel also notified U.S. intelligence personnel shortly after the strike that two innocent civilians had been wrongly killed, including an imam who had "preached a sermon that had insulted AQAP [al Qaeda in the Arabian Peninsula]."  *Secret Details of Drone Strike Revealed As Unprecedented Case Goes to German Court*, The Intercept, 4/17/15, at https://firstlook.org/theintercept/2015/04/17/victim-u-s-drone-strike-gets-day-german-court/.

64.     To this day, nobody in the village knows the identities and affiliations of the three young strangers.  Nor does anyone know what purpose they had in wanting to meet with Salem. All that is known from the accounts of people who saw them before the strike and from their

scattered remains found in the blast area, is that they were young, either still in or just out of their

teens, and that they wanted to discuss Salem's anti-terrorism sermon with him.

65.     Those facts make it highly unlikely any of them were high-ranking members of

al Qaeda or another terrorist organization.  They gave no indication to observers of posing any

urgent threat even to the local villagers in Khashamir, much less the U.S. homeland some 8,000

miles away.

66.     The drone operators also must have been tracking the three young men before

their arrival in the village, well prior to the attack.  Otherwise, the U.S. drone operators would

not have known the three men outside the mosque that evening were the three men they wished

to target, rather than local Khashamir villagers.

## U.S. DRONE POLICY: WILLFUL BLINDNESS

67.     Salem's and Waleed's deaths, both avoidable, are part of a broader picture of

willful official blindness to unnecessary innocent civilian death that pervades the U.S. drone

program.

68.     The U.S. covertly launched its first missile in Yemen in November 2002 when a

CIA-piloted Predator drone fired on a vehicle carrying several passengers, including a U.S.

citizen.  Since then, the drone program has escalated dramatically.  Over the past five years,

President Obama's Administration has taken as many as 200 strikes, killing upwards of 1100

Yemenis. *See* Bureau of Investigative Journalism, "*Get the Data: Drone Wars*", accessed

3/18/15, at http://www.thebureauinvestigates.com/category/projects/drones/drones-graphs/.

69.     With few exceptions, the U.S. policy of killing suspects abroad has remained

shrouded in secrecy.  More than nine years elapsed before the program's existence was

acknowledged in January 2012 in a question and answer session President Obama hosted on

"Google Hangout."  He reassured the public drones were on a "tight leash" and had "not caused

a huge number of civilian casualties".  See President Obama's Google+ Hangout,

WhiteHouse.gov (Jan. 30, 2012), http://www.whitehouse.gov/photos-and-

video/video/2012/01/30/president-obama-s-google-hangout.

70.    In a major address at the National Defense University in May 2013,

President Obama described U.S. drone warfare as a restrained, careful, last-resort exercise of

lethal force.  He asserted that drones were used only when the danger to the U.S. from a target is

"imminent", arrest is not feasible and when there is "near-certainty that no civilians will be killed

or injured."  He justified his extensive reliance on drone warfare with the claim that

"conventional airpower or missiles are far less precise than drones, and likely to cause more

civilian casualties and local outrage."  *Remarks by the President at the National Defense

University,* at https://www.whitehouse.gov/the-press-office/2013/05/23/remarks-president-

national-defense-university.

71.    Yet the strike that killed Salem and Waleed – and dozens of others examined by

external organizations and the media – show the actual U.S. drone program bears little

resemblance to the President's description.  An investigation by the Open Society Foundation

published in April 2015 found significant evidence that drone strikes in Yemen were killing and

injuring civilians.  The strikes investigated raised "serious questions" about the extent to which

the U.S. was complying with international law and "whether the U.S. is using an overbroad

definition of who may lawfully be targeted with lethal force."  The organization also detailed

incidents where the alleged targets could have been arrested by the Yemeni government rather

than killed.  "*Death by Drone: Civilian Harm Caused by U.S. Targeted Killings in Yemen,*"

Open Society Foundation, April 13, 2015, at

http://www.opensocietyfoundations.org/sites/default/files/death-drones-report-eng-20150413.pdf.  Investigations by other credible third parties have produced similar findings.  *See* "*Between a Drone and Al-Qaeda,*" Human Rights Watch, Oct. 22, 2013, at www.hrw.org/reports/2013/10/22/between-drone-and-al-qaeda-0.

72.     President Obama's claim that drones are more "precise" than manned aircraft has also been discredited.  A study based upon classified military information carried out by an advisor to the U.S. Joint Forces Command concluded that drone strikes in Afghanistan killed *ten times* as many civilians as strikes from human-operated aircraft from mid-2010 to mid-2011.  Lewis & Holewinski, *Changing of the Guard: Civilian Protection for an Evolving Military,* PRISM 4, no. 2, p. 57, July 2013 (PRISM is a publication of the National Defense University Center for Complex Operations, an organ of the U.S. Department of Defense.)

73.     The large number and notoriety of civilian casualties has intensified anti-American sentiment and action in affected countries.  *See* Lewis & Holewinski, *Changing of the Guard,* supra, at paragraph 12.  The U.N. Special Rapporteur on Counterterrorism and Human Rights, Ben Emmerson, has stated that "[t]he consequence of drone strikes has been to radicalize an entirely new generation."  Engelhardt, *A Rogue Superpower,* Huffington Post, 10/29/13, at www.huffingtonpost.com/tom-engelhardrt/a-rogue-superpower_b_4174080.html.  And a special report published by the Council on Foreign Relations concluded that "there appears to be a strong correlation in Yemen between increased targeted killings since December 2009 and heightened anger toward the United States and sympathy with or allegiance to AQAP."  Zenko, *Reforming U.S. Drone Strike Policies*, January 2013, available at http://www.cfr.org/wars-and-warfare/reforming-us-drone-strike-policies/p29736.

74.     In Yemen, drone strikes are organized, planned, and carried out by both the CIA

and the Defense Department through JSOC.  The CIA and JSOC reportedly "share intelligence

and coordinate attacks" in Yemen.  Greg Miller, *Under Obama, an Emerging Global Apparatus*

*for Drone Killing,* Wash. Post, Dec. 27, 2011, *available at*

http://www.washingtonpost.com/national/national-security/under-obama-an-emerging-global-

apparatus-for-drone-killing/2011/12/13/gIQANPdILP_story.html.

75.     Both organizations maintain "Kill Lists" comprised of named targets (*e.g.*, Anwar

al-Aulaqi).  For strikes against such identified targets—so-called "personality" strikes—serious

questions persist about the precision of attacks and accompanying civilian casualties.  *See You*

*Never Die Twice: Multiple Kills in the U.S. Drone Program,* Reprieve, at

http://www.reprieve.org/uploads/2/6/3/3/26338131/2014_11_24_pub_you_never_die_twice_-

_multiple_kills_in_the_us_drone_program.pdf (finding that in targeting 41 so-called "high

value" targets, each target "died" on average three times at the cost of 1,147 other lives).

76.     But most drone strikes are not even aimed at identified people.  They are instead

what the Administration refers to as "signature" strikes – strikes on *unknown* individuals whose

perceived "pattern of behavior" raises suspicion and where the pattern of behavior is largely

derived from signals intelligence, rather than traditional human intelligence.  *See* Jo Becker &

Scott Shane, *Secret 'Kill List' Proves a Test of Obama's Principles and Will*, N.Y. Times,

5/29/12, at http://www.nytimes.com/2012/05/29/world/obamas-leadership-in-war-on-al-

qaeda.html; *see also* Mark Pomerleau, "How Technology Has Changed Intelligence Collection",

DefenseSystems, Apr. 22, 2015, http://defensesystems.com/Articles/2015/04/22/Technology-

has-changed-intelligence-gathering.aspx?Page=1 ("the lack of human intelligence has placed a

greater stress on signals intelligence to provide military commanders with greater knowledge of

dangerous actors and potential threats."); Gabriel Margolis, *The Lack of HUMINT: A Recurring Intelligence Problem*, Global Security Studies, Spring 2013, Vol. 4, Issue. 2, *available at* http://globalsecuritystudies.com/Margolis%20Intelligence%20(ag%20edits).pdf ("The technical affluence of the United States has permeated the intelligence community and continues to contribute to the intelligence failures of the CIA because of American reliance on technology over human sources.").  In April 2012, a few months before the August 29th strike that took Salem's and Waleed's lives, "signature strikes" were extended from Pakistan to Yemen and the rules around them relaxed even further. *See* Greg Miller, "White House Approves Broader Yemen Drone Campaign", Wash. Post, Apr. 25, 2012, available at http://www.washingtonpost.com/world/national-security/white-house-approves-broader-yemen-drone-campaign/2012/04/25/gIQA82U6hT_story.html; Entous, Gorman & Barnes, *U.S. Relaxes Drone Rules,* Wall Street Journal April 26, 2012, http://www.wsj.com/articles/SB10001424052702304723304577366251852418174.

77.     State Department officials have complained to the White House that targeting criteria for such strikes are "too lax" and that "when the C.I.A. sees 'three guys doing jumping jacks,' the agency thinks it is a terrorist training camp."  Becker and Shane, "*Secret 'Kill List' Proves a Test of Obama's Principles and Will*, New York Times, 5/29/12, at http://nyti.ms/LzQ8mF.

78.     The "signature" the United States uses to identify targets, such as the three young men who came to meet Salem, is chiefly a combination of location and communications data, commonly referred to as "metadata", and content data from interception of emails and telephone calls.  Such data is swept up in mass surveillance systems and then analyzed based on pre-defined criteria to identify people with supposed terrorist connections.  According to a leaked

top-secret U.S. presentation about a program in Pakistan called SKYNET, the criteria used to

identify targets include "travel behavior," "visits to airports," "overnight trips," "excessive SIM

or handset swapping," and "low use, incoming calls only." *See* Cora Currier, Glenn Greenwald,

and Andrew Fishman, "U.S. Government Designated Prominent Al Jazeera Journalist as

'Member of Al Qaeda'," The Intercept, May 8, 2015, available at

https://firstlook.org/theintercept/2015/05/08/u-s-government-designated-prominent-al-jazeera-

journalist-al-qaeda-member-put-watch-list/.

79.     Rather than confirming a target's identity with operatives or informants on the

ground – the traditional "human intelligence approach" – the CIA or JSOC can also order a strike

based on the activity and location of the mobile phone a person is believed to be using.  A former

JSOC drone operator who also worked with the NSA clarified: "People get hung up that there's a

targeted list of people . . . It's really like we're targeting a cell phone.  We're not going after

people – we're going after their phones, in the hopes that the person on the other end of that

missile is the bad guy."  Jeremy Scahill and Glenn Greenwald, *"The NSA's Secret Role in the*

*U.S. Assassination Program",* The Intercept, Feb. 10, 2014, *available at*

https://firstlook.org/theintercept/2014/02/10/the-nsas-secret-role/.

80.     Former CIA Director Michael Hayden put it more bluntly:  "We kill people based

on metadata." See Lee Ferran, "*Ex-NSA Chief: 'We Kill People Based Upon Metadata'*", ABC

News, May 12, 2014, *available at* http://abcnews.go.com/blogs/headlines/2014/05/ex-nsa-chief-

we-kill-people-based-on-metadata/.

81.     Signature strike targets are by definition unidentified, and are selected and killed

based on no more than data-driven suspicion.  As the August 29th strike that killed Salem and

Waleed illustrates, the use of lethal force based on suspicion belies President Obama's claim at

the National Defense University that U.S. drones target only "terrorists who pose a continuing and imminent threat to the American people" and that before any strike is authorized "there must be near-certainty that no civilians will be killed or injured—the highest standard we can set." *Remarks by the President at the National Defense University, available at* https://www.whitehouse.gov/the-press-office/2013/05/23/remarks-president-national-defense-university. *See* Danya Greenfield, *The Case Against Drone Strikes on People Who Only 'Act' Like Terrorists,* The Atlantic, August 19, 2013, *available at* http://www.theatlantic.com/international/archive/2013/08/the-case-against-drone-strikes-on-people-who-only-act-like-terrorists/278744/.

### AFTERMATH

82.     The August 29th strike and subsequent U.S. drone operations fundamentally changed the conditions of local life.  The community was thrown into a state of anger, despair and frustration over the loss of two highly regarded men.  That loss was compounded by the traumatizing aftermath of a large blast area strewn with body parts of five men.

83.     Nor did the trauma end on August 29th.  The months following the August 29th strike brought news of at least 5 other strikes in Hadhramaut, which created great fear of a repeat strike.  Ever since, Khashamir and its environs have been subjected to discernible drone surveillance and strikes.  Residents, including children, can hear the drones, and unsurprisingly have come to live in on-going fear of sudden death by drone.

84.     After the strike, local imams became afraid to speak out against al Qaeda in the way they and Salem had done before the strike.  They feared to do so would endanger their communities as well.  Salem's anti-al Qaeda initiative thus died with him.

85.     Fear and sadness consumed Khashamir and the bin Ali Jaber family.  The trauma of picking through the blast rubble for body parts to bury was compounded over months and years, as they sought in vain for some recognition of the wrong that had been done.  Faisal remained in Khashamir for several weeks assisting family.  After his return to Sana'a, he had sustained psychological trauma so serious that he could not work for half a year.  He subsequently lost his job.

86.     Soon after the strike, the victims' families asked Faisal and other community leaders to form a committee to represent them before government officials and seek justice for the family.  They hoped for exoneration of Salem and Waleed, compensation for the family, and to ensure the tragedy of August 29th would not be repeated.  The committee's repeated approaches to Yemeni officials were fruitless.

87.     In November 2013, having hit a brick wall in Yemen, Faisal travelled to the United States, only to run into another one.  He met Congressmen and Senators, and representatives from the White House National Security Council.  While several individuals expressed condolences to Faisal for the strike that killed his family members, no one could or would provide an official explanation or acknowledgement that these were innocent victims.  *See* Worth et al, "*Search for Answers on Drone Strike Leaves Only Silence*," New York Times, Nov. 22, 2013, available at http://www.nytimes.com/2013/11/23/world/middleeast/a-yemenis-long-trip-to-seek-answers-about-a-drone-strike.html?_r=0.

88.     Faisal's visit seemed to reignite Yemeni government interest in the case.  Shortly after his visit, the Yemeni government ordered the families receive the equivalent of around $55,000 US in Yemeni currency.  The money was tendered on July 22, 2014 in Yemen to the families of Salem and Waleed.  The payment was accompanied by documents from the Yemeni

government indicating payment was a "condolence" authorized by the President of Yemen for the victims' families and also on account of property damage caused by the strike.

89.     But there was also a second, unofficial tranche of money given to the families. The money totaled $100,000 U.S. and came in what appeared to be freshly-printed U.S. dollar bills.  The money was offered on July 8th during a meeting in Sana'a at Yemen's National Security Bureau (NSB). (An official who described himself as a legal affairs director for the NSB contacted committee members and requested this meeting.)  In the meeting, the NSB official offered Faisal and another family member, Wahib, more "condolences" for their loss. He then proffered a plastic bag filled with $100,000 in sequentially marked U.S. currency. Despite repeated queries by Faisal and Wahib as to the origins and purpose of the money, the official refused to explain further.  The NSB official implied the money was from the U.S., but refused explicitly to state it. Faisal and Wahib left the office without the money, stating they needed to consult with the families of the victims about whether this secret payment should be accepted.

90.     The families were understandably frustrated that the money was to be given without any formal accountability.  Nonetheless, both families had lost their chief breadwinners to the strike.  Their economic situations were so dire that they decided they had no practical alternative other than to accept this further "condolence" payment.  Wahib returned the next day to meet again with the NSB official.  Before accepting the money, he again demanded to know its source and purpose.  This time, after further verbal wrangling, the NSB official acknowledged off the record that the money had come from the U.S. but refused to provide any further information or any documentation of the payment.  When Wahib insisted on creating a receipt

documenting the delivery of the money, the NSB official changed his position and insisted that Wahib write "this money comes from the NSB only."

### No Closure or Accountability Without Transparency

91.     In the absence of any acknowledgement of U.S. responsibility for the August 29th strike, the plaintiffs, other bin Ali Jaber family members and the Khashamir community continue to fear additional arbitrary drone strikes, especially when any stranger comes to the village.

92.     During his CIA confirmation proceedings, John Brennan unambiguously and under oath stressed the importance of acknowledging and accepting responsibility when drone strikes go awry:

> I believe we need to acknowledge [when we kill the wrong person].  I believe we need to acknowledge it to our foreign partners.  *We need to acknowledge it publicly.*  There are certain circumstances where there are considerations to be taken into account, but as far as I'm concerned, if there is this type of action that takes place, in the interest of transparency, I believe the United States Government should acknowledge it.

See U.S. Senate Select Committee on Intelligence, *Open Hearing on the Nomination of John O. Brennan to be Director of the Central Intelligence Agency*, 2/7/13, http://www.intelligence.senate.gov/130207/transcript.pdf.  (Emphasis added)

93.     President Obama has also spoken repeatedly about the value of transparency in relation to the U.S.'s controversial drone operations.  He did so in his highly publicized April 23, 2013 National Defense University speech about U.S. anti-terror policies.  See *Remarks by the President at the National Defense University,* at https://www.whitehouse.gov/the-press-office/2013/05/23/remarks-president-national-defense-university ("This week, I authorized the declassification of this action, and the deaths of three other Americans in drone strikes, to facilitate transparency and debate on this issue and to dismiss some of the more outlandish claims that have been made."); *Fact Sheet: U.S. Policy Standards and Procedures for the Use of*

*Force in Counterterrorism Operations Outside the United States and Areas of Active Hostilities,*

("[T]he President has decided to share, in this document, certain key elements of these standards and procedures with the American people so that they can make informed judgments and hold the Executive Branch accountable."), available at https://www.whitehouse.gov/the-press-office/2013/05/23/fact-sheet-us-policy-standards-and-procedures-use-force-counterterrorism.

94.     But the most explicit apology from President Obama took place on April 23, 2015, when the President took to the airwaves to acknowledge, mourn and apologize for the mistaken killing of two innocents, one an American, the other an Italian, in a U.S. drone strike in Pakistan.  Entous, *et al,* "*American, Italian Hostages Killed in CIA Drone Strike in January,*" 4/23/15 Wall Street Journal, http://www.wsj.com/articles/american-italian-hostages-killed-in-cia-drone-strike-in-january-1429795801.

95.     In his statement apologizing for these fresh innocent deaths, the President explained that as soon as the mistake was confirmed he personally directed that the matter be declassified "because the [dead men's] families deserve to know the truth" and because "the United States is a democracy committed to openness in good times and in bad."

https://www.whitehouse.gov/the-press-office/2015/04/23/statement-president-deaths-warren-weinstein-and-giovanni-lo-porto.

96.     Plaintiffs ask no more than what President Obama has provided to other families of those mistakenly killed in a drone strike.  Nor are they asking for more than what he and Director Brennan have previously acknowledged is the responsibility of the U.S. to provide.

## THE STRIKE VIOLATED DOMESTIC AND INTERNATIONAL LAW

### THE STRIKE WAS AN UNLAWFUL EXTRAJUDICIAL KILLING

97.     In August 2012, the United States was not at war with Yemen.  Nor was the

Yemeni government involved in an armed conflict with al Qaeda within its borders.  *See* ICTY,

The Prosecutor v Dusko Tadic, Judgment, IT-94-1-T, 7 May 1997, para. 561-568 ("In an armed

conflict of an internal or mixed character, these closely related criteria [of intensity and

organization] are used solely for the purpose, as a minimum, of distinguishing an armed conflict

from banditry, unorganized and short-lived insurrections, or terrorist activities, which are not

subject to international humanitarian law.")

98.     The United States has purported to operate the drone program under the 2001

Authorization for the Use of Military Force ("AUMF").  However, the AUMF is specifically

targeted at those "nations, organizations, or persons" with links to the September 11, 2001

terrorist attacks. AQAP, the United States' purported target in Yemen, did not exist in 2001 at

the time of the drafting of the AUMF, and is therefore entirely outside the scope of the statute.

Even if applicable, under the AUMF clause allowing action to "prevent any future acts of

terrorism against the United States," there is no evidence that the three individuals killed

alongside Salem and Waleed posed such threats of terrorism against the United States.  The

AUMF is therefore not a source of authority for the August 29th strike.

99.     Because no armed conflict existed in Yemen to justify the use of international

humanitarian law, the U.S. and Yemen were required to act within the bounds of international

human rights law. Article 6(1) of the International Covenant on Civil and Political Rights

("ICCPR"), which has been ratified by and is binding upon the United States, codifies the

customary principle that "No one shall be arbitrarily deprived of their life."  *See* International

Court of Justice, Legality of the Threat or Use of Nuclear Weapons, Advisory Opinion of 8 July

1996, ICJ Reports 1996, paragraph 25; Legal Consequences of the Construction of a Wall in the

Occupied Palestinian Territory, Advisory Opinion of 9 July 2004, ICJ Reports 2004, paragraph

106; Armed Activities on the Territory of the Congo (Democratic Republic of the Congo v.

Uganda), ICJ Reports 2005, paragraphs 216-20, 345(3); Human Rights Committee, General

Comment no 31 on the nature of the general legal obligation imposed on States parties to the

Covenant UN Doc CCPR/C/21/Rev.1/Add.13 (2004), paragraph 11.  See also Reports of the UN

Special Rapporteur on extrajudicial, summary or arbitrary executions: UN Doc E/CN.4/2005/7

(22 December 2004), paras 41- 54, 77-79, 84 and 86; UN Doc A/HRC/4/20 (29 January 2007),

paragraph 19; UN Doc A/HRC/4/20/Add.1 (12 March 2007), pages 342-363; UN Doc A/62/265

(16 August 2007), paras 27- 32; UN Doc A/HRC/14/24/Add.6 (28 May 2010) ['Study on

targeted killings'], paragraphs 28-36.

100.     This principle is codified in the Torture Victim Protection Act's ban on

extrajudicial killings.  Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350

Note).  The August 29th strike was executed under color of Yemeni authority.  At the time of the

strike, the President of Yemen personally approved every drone strike inside Yemen.  Miller,

"*Yemeni president acknowledges approving U.S. drone strikes,*" Washington Post, Sep. 29 2012,

http://www.washingtonpost.com/world/national-security/yemeni-president-

acknowledgesapproving-us-drone-strikes/2012/09/29/09bec2ae-0a56-11e2-afff-

d6c7f20a83bf_story.html.

101.     The fact that the strike was executed under color of Yemeni authority does not

legitimize extrajudicial killing by U.S. personnel in violation of applicable international law.

Such approval merely absolves the U.S. of a separate and independent violation of Section 2(4)

of the United Nations Charter.  *See* http://www.un.org/en/documents/charter/chapter1.shtml

("All Members shall refrain in their international relations from the threat or use of force against

the territorial integrity or political independence of any state").

102.    Rather, the authorization of the Yemeni government merely means the U.S. bears

secondary liability.  The Supreme Court recently affirmed that "the TVPA contemplates liability

against officers who do not personally execute the torture or extrajudicial killing."  *Mohamad v.*

*Palestinian Auth.*, 132 S. Ct. 1702, 1709, 182 L. Ed. 2d 720, 729 (2012) (citation omitted).  Even

before Mohamad, "virtually every court to address the issue" has "recogniz[ed] secondary

liability for violations of international law since the founding of the Republic."  *Aziz v. Alcolac,*

*Inc.*, 658 F.3d 388, 396 (4th Cir. 2011) (internal quotation marks and alterations omitted); accord

*Doe VIII v. Exxon Mobil Corp.*, 654 F.3d 11, 19 (D.C. Cir. 2011) (citing *The Presbyterian*

*Church of Sudan v. Talisman*, 582 25 Case 1:04-cv-01360-LMB-JFA Document 366 Filed

08/28/12 Page 25 of 38 PageID# 2455 F.3d 244, 258-59 (2d Cir. 2009); *Khulumani v. Barclay*

*Nat'l Bank*, 504 F.3d 254, 260 (2d Cir. 2007) (per curiam); *Sinaltrainal v. Coca-Cola Co.*, 578

F.3d 1252, 1258 n.5 (11th Cir. 2009), abrogated on other grounds, *Mohamad*, 132 S. Ct. at 1706

& n.2).

103.    An intentional extrajudicial killing may only be justifiable if at the time of its use,

it is "strictly unavoidable" in order to defend against an "imminent threat of death."  *See* UN

Basic Principles on the Use of Force and Firearms by Law Enforcement Officials (1990) at

Principle 9 [full cite].  The UN Basic Principles reflect the obligations of states under Article 6 of

the ICCPR and are applicable not only to law enforcement officials, but "military authorities,

whether uniformed or not" and "state security forces" when those authorities are exercising

"police powers" (including any use of force outside of a situation of armed conflict). See note 1

to the UN Basic Principles on the Use of Force and Firearms by Law Enforcement Officials and the commentary to article 1 of the UN Code of Conduct for Law Enforcement Officials.

104.    There is no indication that the three young visitors in Khashamir posed any threat of death, much less an imminent one, to the United States or its allies.  There is no evidence that either the United States or Yemen made any attempt to arrest or otherwise detain the men in order to neutralize any perceived threat prior to launching a strike outside of armed conflict.  Therefore, the strike that killed the three men along with innocent bystanders Salem and Waleed was unlawful under both U.S. domestic and international human rights law.

**THE STRIKE VIOLATED OF THE LAWS OF WAR**

105.    The United States contends that its drone operations in Yemen are governed by a different element of customary international law: the laws of war.  *See* John Brennan, Assistant for Homeland Security and Counterterrorism, *The Ethics and Efficacy of the President's Counterterrorism Strategy,* Speech at Woodrow Wilson International Center, Apr. 30, 2012, reported at www.lawfareblog.com/2012/04/brennanspeech (setting forth "the basic principles of the law of war that govern the use of force" as applicable to U.S. lethal drone operations).

106.    While plaintiffs contend that the laws of war are inapplicable to U.S. drone operations in Yemen, if the laws of war do apply they too establish that the August 29th strike violated accepted norms of customary international law.

107.    Under the laws of war, codified by the Geneva conventions, lethal force by the United States is subject to the established principles of distinction and proportionality.  These principles are universally accepted norms of the laws of war.

108.    The principle of distinction requires that "[t]he parties to the conflict must at all times distinguish between civilians and combatants.  Attacks may only be directed against

combatants.  Attacks must not be directed against civilians."  Rule 1, Customary Humanitarian Law, International Committee of the Red Cross, available at https://www.icrc.org/customary-ihl/eng/docs/v1_rul_rule1.

109.    The principle of proportionality holds that "[l]aunching an attack which may be expected to cause incidental loss of civilian life, injury to civilians, damage to civilian objects, or a combination thereof, which would be excessive in relation to the concrete and direct military advantage anticipated, is prohibited."  Rule 1, Customary Humanitarian Law, International Committee of the Red Cross, available at https://www.icrc.org/customary-ihl/eng/docs/v1_chapter4_rule14.

110.    The United States acknowledges that these principles are applicable to and binding on U.S. drone operations.  Using Mr. Brennan's words from his April 2012 speech at the Woodrow Wilson International Center, the principle of distinction requires "that only military objectives may be intentionally targeted and that civilians are protected from being intentionally targeted;" and the principle of proportionality requires that "the anticipated collateral damage of an action cannot be excessive in relation to the anticipated military advantage."  Under both of these settled customary principles of the international law of war, the August 29th strike was illegitimate and unlawful.

111.    As a threshold matter, there is no evidence or indication suggesting that the three youths were even legitimate military targets in the first place.  Their approach to Khashamir and their interaction with its residents had been peaceful.  There were no U.S. or Yemeni forces or military objectives in the vicinity that were in need of protection against three young Yemeni men.

112.    But even if the three men were affiliated with al Qaeda or some other renegade terrorist group, and by that or other behavior had rendered themselves outlaws and the legitimate object of military action, the circumstances clearly permitted their arrest rather than extrajudicial killing. *See* Mazetti & Schmitt, *Terrorism Case Renews Debate Over Drone Hits,* New York Times April 12, 2015 ("The decision to use an allied intelligence service to arrest Mr. Farekh has bolstered a case made by some that capturing — rather than killing — militant suspects, even in some of the world's most remote places, is more feasible than the orders for hundreds of drone strikes might indicate.")

113.    The three young men seeking Salem could have been interdicted earlier in the day at manned checkpoints close to the village along both roads in and out of Khashamir.  If more robust detaining force was called for, an allied [i.e., Yemeni] military base was only 2.5-3 kilometers away from where the missiles hit.  The circumstances show that the principle of Proportionality was grossly violated because the loss of life and subsequent damage was excessive in relation to the concrete and direct military advantage anticipated.

114.    If, for reasons that are presently incomprehensible, lethal force was warranted against the three youths, and a drone strike the only available lethal option, the principle of distinction required that the strike occur outside the presence of innocent civilians such as Salem and Waleed.  Implementing that principle, U.S. policy explicitly required that "there must be near-certainty that no civilians will be killed or injured."  *Remarks by the President at the National Defense University,* at https://www.whitehouse.gov/the-press-office/2013/05/23/remarks-president-national-defense-university.

115.    On August 29th, drone operators had the option to strike the three youths before they came to the village or before or after they held the meeting with Salem.  Yet, the

circumstances indicate just the opposite occurred—the drone operator(s) waited until Salem and

Waleed joined the three youths to strike. Under all scenarios, the deaths of Salem and Waleed

violated the principle of distinction, requiring that all reasonable means be used to spare civilian

life in the accomplishment of even legitimate military objectives.

116.    Outrage, not just sadness and despair, rightly flows from these horrific facts.  Just

as it is clear that the three youths had been remotely monitored before they came to rest at their

eventual killing ground, that same remote monitoring means that the decision to take the lives of

Salem and Waleed was every bit as deliberate and purposeful as was the decision to kill the three

youths.  Drone technology permits remote operators to know with high confidence when

legitimate targets are in the presence of non-combatant civilians or persons whose status is not

known.  Absent truly exigent circumstances, the laws of war and U.S. policy outlaws lethal force

against them.  That August 29th strike happened only <u>after</u> the three youths had come into

company with Khashamir civilians means that, whether or not those who finally authorized the

strike in the presence of Salem and Waleed actually desired their deaths, they deliberately

disregarded the near certainty that those two men would be killed.

117.    Mr. Brennan's April 2012 statement at the Woodrow Wilson Center canvassed

one more traditional element of restraint required of the United States in conducting drone

operations—the principle of humanity, which "requires us to use weapons that will not inflict

unnecessary suffering."  The travail of the bin Ali Jaber family and other residents of Khashamir

is one in a long and ongoing progression of sad examples of how current U.S. drone operations

and overseers pay only lip service to this requirement while in actuality engaging in terrorizing

violence that is, far too often, heedless of the impact on innocent and vulnerable local

populations.

## FIRST CLAIM

**(ALL DEFENDANTS; EXTRA-JUDICIAL KILLING OF SALEM BIN ALI JABER;**

**DECLARATORY JUDGMENT; TORTURE VICTIMS PROTECTION ACT)**

1.      Plaintiffs incorporate all preceding allegations by reference in this First Claim.

2.      The defendants authorized and executed the August 29th strike under the actual or apparent authority of the Republic of Yemen, pursuant to the approval of the strike by the President of Yemen.

3.      By authorizing and executing the unlawful August 29th strike, the defendants, and each of them subjected Salem to extrajudicial killing in violation of the Torture Victim Protection Act of 1991. Act March 12, 1992, P.L. 102-256,106 Stat. 73.

## SECOND CLAIM

**(ALL DEFENDANTS; EXTRA-JUDICIAL KILLING OF WALEED BIN ALI JABER;**

**DECLARATORY JUDGMENT; TORTURE VICTIMS PROTECTION ACT)**

1.      Plaintiffs incorporate all preceding allegations by reference in this Second Claim.

2.      By authorizing and executing the unlawful August 29th strike, the defendants, and each of them subjected Waleed to extrajudicial killing in violation of the Torture Victim Protection Act of 1991. Act March 12, 1992, P.L. 102-256,106 Stat. 73.

## THIRD CLAIM

**(ALL DEFENDANTS; WRONGFUL DEATH OF SALEM BIN ALI JABER;**

**DECLARATORY JUDGMENT; GENEVA CONVENTIONS; ALIEN TORT**

**STATUTE; CUSTOMARY INTERNATIONAL LAW: PRINCIPLE OF DISTINCTION)**

1.      Plaintiffs incorporate all preceding allegations by reference in this Third Claim.

2.      The principle of Distinction between civilians and combatants is a norm of customary international law and the law of war.

3.      This principle was applicable to the U.S. military operations that resulted in the August 29th drone strike that killed Salem.

4.      At the time of the August 29th strike, each of the defendants had chain of command or other supervisory responsibilities for U.S. drone operations in Yemen at the time of the August 29th strike that included the responsibility to take care that U.S. drone operations were conducted in accordance with applicable principles of customary international law, including the principle of Distinction.

5.      Plaintiffs are informed and believe, and therefore allege that U.S. personnel with chain of command or other supervisory responsibilities for U.S. drone operations in Yemen at the time of the August 29th strike, including each of the defendants, deliberately disregarded facts disclosing that the U.S.'s lethal drone operations in Yemen were conducted in violation of the requirements of the laws of war, including without limitation, the principle of Distinction.

6.      The three youths who were killed in that drone strike could have been targeted by a strike either before or after they came into company with Salem and Waleed.  At no time was an attack on them only feasible when they came into company with Salem and Waleed.

7.      The execution of the strike only when the five men were together means that all five were targeted.

8.      Salem was a civilian who was not a legitimate military objective of U.S. military action.

9.      The August 29th Strike, by targeting Salem and Waleed, violated the principle of Distinction and resulted in the wrongful death of Salem.

10.     By their deliberate disregard of the principle of Distinction in the conduct of the U.S. drone warfare operations, including without limitation the August 29th strike, the defendants, and each of them, caused the wrongful death of Salem.

## FOURTH CLAIM

### (ALL DEFENDANTS; WRONGFUL DEATH OF WALEED BIN ALI JABER; DECLARATORY JUDGMENT; GENEVA CONVENTIONS; ALIEN TORT STATUTE; CUSTOMARY INTERNATIONAL LAW: PRINCIPLE OF DISTINCTION)

1.     Plaintiffs incorporate all preceding allegations by reference in this Fourth Claim.

2.     Waleed was a civilian who was not a legitimate military objective of U.S. military action.

3.     By deliberate disregard of the principle of Distinction in the conduct of the U.S. drone warfare operations, including without limitation the August 29th strike, the defendants, and each of them, caused the wrongful death of Waleed.

## FIFTH CLAIM

### (ALL DEFENDANTS; WRONGFUL DEATH OF SALEM BIN ALI JABER DECLARATORY JUDGMENT; GENEVA CONVENTIONS; ALIEN TORT STATUTE; CUSTOMARY INTERNATIONAL LAW: PRINCIPLE OF PROPORTIONALITY)

1.     Plaintiffs incorporate all preceding allegations by reference in this Fifth Claim.

2.     The principle of Proportionality in Attack is a norm of customary international law and the law of war.

3.     This principle was applicable to the U.S. military operations that resulted in the August 29th drone strike that killed Salem and Waleed.

4.      At the time of the August 29th strike, each of the defendants had chain of command or other supervisory responsibilities for U.S. drone operations in Yemen at the time of the August 29th strike that included the responsibility to take care that U.S. drone operations were conducted in accordance with applicable principles of customary international law, including the principle of Proportionality.

5.      Plaintiffs are informed and believe, and therefore allege that U.S. personnel with chain of command or other supervisory responsibilities for U.S. drone operations in Yemen at the time of the August 29th strike, including each of the defendants, deliberately disregarded facts disclosing that the U.S.'s lethal drone operations in Yemen were conducted in violation of the requirements of the laws of war, including without limitation, the principle of Proportionality.

6.      There was no need for the use of lethal force against the three youths who were killed in that drone strike.  Arrest rather than extrajudicial killing was a feasible available alternative.  There was, therefore, no military necessity for their deaths and those deaths were not a significant or important military objective that would justify any significant risk of civilian casualties or property damage.

7.      Even if their deaths were or were evaluated at the time to be legitimate military objectives, the three young men could have been targeted by a strike either before or after they came into company with Salem and Waleed.  At no time was it true that a lethal attack on them was only feasible when they were in company with Salem and Waleed.

8.      The execution of the strike when the five men came together means that all five were targeted.

9.      Salem was a civilian who was not a legitimate military objectivee of U.S. military action and he was killed in a drone strike that had no military objective that could not have been accomplished without risk to his life.

10.     The August 29th Strike violated the principle of Proportionality and resulted in the wrongful death of Salem.

11.     By their deliberate disregard of the principle of Proportionality in the conduct of the U.S. drone warfare operations, including without limitation the August 29th strike, the defendants, and each of them, caused the wrongful death of Salem.

## SIXTH CLAIM

### (ALL DEFENDANTS; WRONGFUL DEATH OF WALEED BIN ALI JABER DECLARATORY JUDGMENT; GENEVA CONVENTIONS; ALIEN TORT STATUTE; CUSTOMARY INTERNATIONAL LAW: PRINCIPLE OF PROPORTIONALITY)

12.     Plaintiffs incorporate all preceding allegations by reference in this Sixth Claim.

13.     Waleed was a civilian who was not a legitimate military objective of U.S. military action and he was killed in a drone strike that had no military objective that could not have been accomplished without his death.

14.     The August 29th Strike violated the principle of Proportionality and resulted in the wrongful death of Waleed.

15.     By their deliberate disregard of the principle of Proportionality in the conduct of the U.S. drone warfare operations, including without limitation the August 29th strike, the defendants, and each of them, caused the wrongful death of Waleed.

**RELIEF REQUESTED**

On the basis of the foregoing, plaintiffs seek and are entitled to a declaration from this Court as follows:

A.      On the First Claim, that defendants and each of them by their deliberate conduct as alleged subjected Salem to extra-judicial killing in violation of the Torture Victims Protection Act; and

B.      On the Second Claim, that defendants and each of them by their deliberate conduct as alleged subjected Waleed to extra-judicial killing in violation of the Torture Victims Protection Act.

C.      On the Third and Fifth Claims, that defendants and each of them by their deliberate conduct wrongfully caused the death of Salem by an unlawful drone strike executed in violation of customary international law;

D.      On the Fourth and Sixth Claims, that defendants and each of them by their deliberate conduct wrongfully caused the death of Waleed by an unlawful drone strike executed in violation of customary international law.

Respectfully submitted this 7th day of June, 2015 by

MCKOOL SMITH, P.C.

/s/Brent Rushforth
ROBERT L. PALMER
*Bar No. 151399 (DC)*
CAROLINE WALTERS
*Bar No.239054 (CA)*
LEE POTTS
*Bar No. 126197 (CA)*
MCKOOL SMITH, P.C.
865 South Figueroa Street Suite 2900
Los Angeles, CA 90017
Telephone: (213) 694-1200
Telecopier: (213) 694-1234
rpalmer@mckoolsmithhennigan.com
cwalters@mckoolsmithhennigan.com
lpotts@mckoolsmithhennigan.com

BRENT N. RUSHFORTH
*Bar No. 13235 (DC)*
TIFFANY C. HEAVLIN
*Bar No. 1020997 (DC)*
MCKOOL SMITH, P.C.
1999 K Street NW, Suite 600
Washington, DC 20006-1011
Telephone: (202) 370-8300
Telecopier: (202) 370-8344
brushforth@mckoolsmith.com
theavlin@mckoolsmith.com

CORI CRIDER
*Bar No. 4525721 (NY)*
JENNIFER GIBSON
*Bar No. 288516 (CA)*
ALKA PRADHAN
*Bar No. 1004387 (DC)*
REPRIEVE
405 Lexington Avenue
62nd Floor
New York, NY 10174
cori@reprieve.org.uk
jennifer.gibson@reprieve.org.uk
alka.pradhan@reprieve.org

**ATTORNEYS FOR Plaintiffs**