UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| AHMED SALEM BIN ALI JABER, *et al.*, | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | | |
| v. | | Civil Action No. 15-0840 (ESH) |
| UNITED STATES OF AMERICA, *et al.*, | | |
| Defendants. | | |

## **MEMORANDUM OPINION**

This case arises from an alleged drone strike that killed five people in Eastern Yemen on August 29, 2012.  (Compl. [ECF No. 1] ¶¶ 1, 61.)  The estates of two of the victims, Salem and Waleed bin Ali Jaber ("Salem" and "Waleed"), bring this suit through a family representative seeking a declaration that the United States and various government officials[1] (1) violated the Torture Victim Protection Act ("TVPA") by carrying out extra-judicial killings, and (2) wrongfully caused the deaths of Salem and Waleed in violation of customary international law. (*See id.* at 40.)  Defendants have moved to dismiss, raising both jurisdictional and merits

---

[1] Plaintiffs have asserted claims against President Obama, former Secretary of Defense Leon Panetta, former CIA Director David Petraeus (the "named defendants'), and three unknown defendants who either approved, authorized, and/or carried out the alleged drone strike (the "Doe defendants").  (*See* Compl. ¶¶ 36-41.)  Pursuant to the Westfall Act, 28 U.S.C. § 2679, the Attorney General has certified that the named defendants were acting within the scope of their employment during the alleged events at issue.  (*See* Certification [ECF No. 10-1].)  As such, the United States was substituted for the named defendants as to Counts 3-6.  (*See* Oct. 1, 2015 Minute Order.)  Counts 1-2 assert statutory claims and thus are exempt from the Westfall Act, *see* 28 U.S.C. § 2679(b)(2)(B), so the named defendants remain parties to those counts.

objections to the complaint.[2]  Because the Court concludes that it lacks subject matter jurisdiction, defendants' motion will be granted.

## BACKGROUND

Plaintiffs allege that in the early afternoon of August 29, 2012, three unidentified young men drove into the remote Yemeni village of Khashamir and began asking locals where they could find Salem.  (*See* Compl. ¶ 51.)  A moderate Islamic preacher, Salem had recently given a sermon criticizing al Qaeda's theological justification for its violence, and the locals feared that the unknown young men had come seeking reprisal.  (*Id.* ¶¶ 45, 47, 51.)  After twice being told that Salem was visiting nearby villages, the young men returned after sundown to wait outside the mosque where Salem was leading evening prayers.  (*See id.* ¶¶ 51-53.)  When Salem emerged, they sent a local child to ask him to meet with them, causing Salem to wonder aloud if he might be in danger.  (*Id.* ¶¶ 53-54.)  Salem's nephew Waleed, a local policeman, offered to accompany him to the meeting to keep the peace.  (*Id.* ¶¶ 43, 54.)  Salem, Waleed, and two of the men then sat down together under a palm tree, while the third watched from a short distance away.  (*See id.* ¶ 55.)  Soon after, members of the Ali Jaber family allegedly "heard the buzzing of the drone, and then heard and saw the orange and yellow flash of a tremendous explosion." (*Id.* ¶ 57.)  The first two missiles hit Salem, Waleed, and the two men, while the third hit the onlooker, and the fourth hit the men's car.  (*Id.* ¶ 59.)  All five men were killed.  (*Id.* ¶ 61.)

---

[2] Although the Doe defendants have not yet been identified or served in this matter, "[a]n action may proceed against a party whose name is unknown if the complaint makes allegations specific enough to permit the identity of the party to be ascertained after reasonable discovery." *See Bloem v. Unknown Dep't of the Interior Emps.*, 920 F. Supp. 2d 154, 158 (D.D.C. 2013) (quoting *Estate of Rosenberg by Rosenberg v. Crandell,* 56 F.3d 35, 37 (8th Cir. 1995)).  Plaintiffs' allegations of a drone strike in a particular Yemeni village on a particular date are certainly specific enough to allow identification of the Doe defendants through discovery.  By the same token, the United States is entitled to move to dismiss on behalf of the Doe defendants.  *See Bloem*, 920 F. Supp. 2d at 157 n.1.

Plaintiffs assert that the United States has been carrying out a covert policy of drone strikes in Yemen since 2002, which has injured and killed Yemeni civilians. (*Id.* ¶¶ 68, 71.) They claim that the strike that killed Salem and Waleed was a "signature" strike, in which an unidentified person is targeted based upon a pattern of suspicious behavior, such as that exhibited by the three young men who came to meet Salem. (*See id.* ¶¶ 76, 78.) They also assert that it is "highly unlikely [that] any of [the young men] were high-ranking members of al Qaeda or another terrorist organization," and that the men showed no signs of posing an urgent threat either to local villagers or to the United States. (*Id.* ¶ 65.) Plaintiffs argue that the drone operators must have been tracking the three men before they arrived in the village, as they would not have otherwise been able to distinguish them from other villagers. (*Id.* ¶ 66.) From this, they infer that U.S. officials must have known of non-lethal alternatives to the drone strike, such as having the men arrested at one of the manned checkpoints near Khashamir or calling in support from a nearby Yemeni military base. (*See id.* ¶ 113.) By extension, even assuming that lethal force was necessary, they allege that the drone operators must have known that the men could have been targeted outside of the village, away from Salem and Waleed. (*See id.* ¶¶ 114-15.)

In the hours after the strike, Faisal bin Ali Jaber—the uncle of Waleed and brother-in-law of Salem—received a phone call from a purported representative of Yemen's security services, who apologized and stated that Salem and Waleed were "not the targets." (*Id.* ¶¶ 34, 62.) Initially, Faisal sought the exoneration of Salem and Waleed and compensation from the Yemeni government, but when that was unsuccessful, he travelled to the United States to meet with various government officials and congressmen. (*See id.* ¶¶ 86-87.) Although Faisal received no official explanation or acknowledgment from U.S. officials, the families of Salem and Waleed

did receive the equivalent of $55,000 in Yemeni currency months after Faisal's return to Yemen. (*Id.* ¶¶ 87-88.)  They also received a plastic bag with $100,000 in sequentially marked U.S. currency, which a Yemeni security official told Faisal was "from the U.S.," a statement that the official later retracted.  (*See id.* ¶¶ 89-90.)

Faisal's efforts on behalf of the families continue today, as he seeks to prosecute this lawsuit on behalf of the representatives of Salem's and Waleed's estates.  Those representatives, Ahmed Salem bin Ali Jaber and Esam Abdullah Abdulmahmoud bin Ali Jaber ("Ahmed" and "Esam"), have pleaded in their Complaint—and submitted signed powers of attorney affirming—that it is impossible for them to leave Yemen to pursue this lawsuit due to their "family, financial and employment circumstances."  (*See* Compl. ¶¶ 26-27, 30; Ex. B to Pls.' Opp'n Br.)  Moreover, they assert that volatile political conditions "render travel within and from Yemen dangerous."  (Compl. ¶¶ 27, 30; *see also* Ex. A to Pls.' Opp'n Br. ¶ 6.)  Finally, they assert that, even before the ongoing civil war broke out in March 2015, "telephone contact was sporadic and difficult" from Khashamir, and that "[t]eleconferencing, internet and other forms of communication were nearly impossible."  (Ex. A to Pls.' Opp'n Br. ¶¶ 3, 6.)  By contrast, Faisal was travelling outside Yemen when the civil war began, and he now lives in Montreal where he is seeking asylum.  (Ex. A to Pls.' Opp'n Br. ¶ 7.)  As such, he attests that he is "easily contactable and able to participate fully in these proceedings" on behalf of Ahmed and Esam. (*Id.*)

## ANALYSIS

### I. LEGAL STANDARD

Defendants assert that the Court lacks jurisdiction to hear plaintiffs' claims, *see* Fed. R. Civ. P. 12(b)(1), and therefore the Court must address those arguments at the outset.  *See Steel*

*Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998).  Under Rule 12(b)(1), plaintiffs bear the burden of establishing that the Court has jurisdiction.  *See US Ecology, Inc. v. U.S. Dep't of the Interior*, 231 F.3d 20, 24 (D.C. Cir. 2000).  Moreover, because jurisdictional elements are "not mere pleading requirements but rather an indispensable part of the plaintiff's case," they must be supported with evidence "in the same way as any other matter on which the plaintiff bears the burden of proof; i.e., with the manner and degree of evidence required at successive stages of the litigation."  *Al-Aulaqi v. Obama*, 727 F. Supp. 2d 1, 13 (D.D.C. 2010) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 561 (1992)).  The Court must "construe the complaint in favor of the complaining party," *see Warth v. Seldin,* 422 U.S. 490, 501 (1975), but plaintiffs' factual allegations will bear closer scrutiny than they would under Rule 12(b)(6).  *See Al-Aulaqi*, 727 F. Supp. 2d at 13-14.

Defendants also move to dismiss for failure to state a claim under Rule 12(b)(6).  To survive such a motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face,'" such that a court may "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678.  Thus, "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Twombly*, 550 U.S. at 555 (citations omitted).

## II.   NEXT FRIEND STANDING

Defendants first argue that plaintiffs lack "next friend" standing, which would allow the action to be prosecuted by Faisal on behalf of the real parties in interest, estate representatives

Ahmed and Esam.  (*See* Defs.' Mot. to Dismiss at 6-11.)  Defendants claim that in cases involving mentally competent adults, next friend standing has only been recognized in habeas corpus cases, and that plaintiffs fail to show that Ahmed and Esam lack access to the courts. (*See id.*)  Neither argument is persuasive.

The traditional prerequisites for next friend standing were laid out by the Supreme Court in *Whitmore v. Arkansas*, 495 U.S. 149 (1990):

> First, a "next friend" must provide an adequate explanation—such as inaccessibility, mental incompetence, or other disability—why the real party in interest cannot appear on his own behalf to prosecute the action.  Second, the "next friend" must be truly dedicated to the best interests of the person on whose behalf he seeks to litigate, and it has been further suggested that a "next friend" must have some significant relationship with the real party in interest.  The burden is on the "next friend" clearly to establish the propriety of his status and thereby justify the jurisdiction of the court.

*Id.* at 163-64 (internal citations omitted).  Although it is true that *Whitmore* focused largely on the habeas context, noting that next friend standing was first recognized in the English Habeas Corpus Act of 1679 and that Congress has authorized next friends to file habeas petitions, it recognized that courts have applied the doctrine in other settings.  *See id.* at 162-63 & n.4.  More importantly, *Whitmore* itself was not a habeas case, but instead, it involved a prisoner's attempt to appeal his fellow inmate's state-court conviction and death sentence.  *Id.* at 164.  After pointing out that Congress had not authorized next friend standing in that context, the Court expressly declined to hold that such statutory authorization is necessary, instead finding that Whitmore failed to meet his burden on the merits.  *See id.* at 164-66.  As such, the most natural reading of *Whitmore* is that next friend standing is *not* limited to habeas cases, but instead may be invoked if plaintiffs can sufficiently demonstrate its necessity.  *See Carson P. ex rel. Foreman v. Heineman*, 240 F.R.D. 456, 516 (D. Neb. 2007) ("Although *Whitmore's* next friend analysis was first enunciated in the context of habeas law, it has been extended to general civil litigation .

6

. . ."); *see also Al-Aulaqi*, 727 F. Supp. 2d at 17 (reaching the merits of plaintiff's next friend arguments in a non-habeas action for declaratory and injunctive relief).[3]

The only remaining question, then, is whether plaintiffs have met their burden to establish the propriety of next friend standing here. Faisal undoubtedly satisfies the second requirement—he has shown his dedication to the estates' best interest by tirelessly seeking official acknowledgement of the alleged incident and compensation for the families, both here and in Yemen. (*See* Ex. A to Pls.' Opp'n Br. ¶ 5.) The same is true for the "significant relationship" requirement, as Faisal is the uncle of Waleed and Esam and related by marriage to Salem and Ahmed. (*See* Ex. B to Pls.' Opp'n Br.) Defendants do not argue otherwise. Instead, they claim that plaintiffs have not sufficiently demonstrated Ahmed's and Esam's inability to access the courts. (*See* Def.'s Mot. to Dismiss at 9-11.) As it must on a motion to dismiss, the Court accepts as true plaintiffs' sworn statements that their financial hardships and the ongoing civil war in Yemen make it impossible for them to travel to the United States. (*See* Ex. B to Pls.' Opp'n Br.) Defendants speculate that, even if plaintiffs cannot physically leave Yemen, they "*may* be able to participate in any court hearings by telephone or even video conference." (*See* Defs.' Mot. to Dismiss at 10 (emphasis added).) Again, on a motion to dismiss, defendants' speculation cannot defeat plaintiffs' sworn statement that—even before the civil war— "telephone contact was sporadic and difficult" from Khashamir, and that "[t]eleconferencing, internet and other forms of communication were nearly impossible." (Ex. A to Pls.' Opp'n Br. ¶

---

[3] Furthermore, and contrary to defendants' assertion, next friend standing *has* been recognized for mentally competent adults outside of the habeas context. *See, e.g.*, *Hopper v. Carter*, 572 F.2d 87, 88 (2d Cir. 1978) (reaching merits of claims brought on behalf of missing servicemen by their next friends); *see also Gudavadze v. Kay*, 556 F. Supp. 2d 299, 301 n.2 (S.D.N.Y. 2008) (brother of civil defendant who was imprisoned in Belarus "[p]lainly" satisfied *Whitmore*'s next friend requirements).

3.)  As such, the Court finds that Ahmed and Esam are sufficiently inaccessible to invoke next friend standing, at least at this stage of the proceedings.

Defendants cite *Al-Aulaqi*, 727 F. Supp. 2d at 17 n.3, for the proposition that, even on a motion to dismiss, the Court need not accept plaintiffs' "bald assertion" of inaccessibility. (Defs.' Mot. to Dismiss at 10 n.4.)  But plaintiffs have offered far more than a bald assertion—they cite financial hardship, familial responsibilities, an ongoing civil war, and poor communications from the remote Yemeni village where the families live, to show why they can neither travel to the United States nor meaningfully participate from Yemen. (*See* Exs. A & B to Pls.' Opp'n Br.)  By contrast, Al-Aulaqi's father claimed his son was "inaccessible" while offering facts showing that, as a wanted enemy combatant, his son simply feared the consequences of appearing before a U.S. court. *Al-Aulaqi*, 727 F. Supp. 2d at 19 ("To the extent that Anwar Al–Aulaqi is currently incommunicado, that is the result of his own choice."). Moreover, unlike plaintiffs here, Al-Aulaqi apparently made no assertion that remote communication was impossible or unavailable to him. *See id.* at 18 n.4.  Finally, the Court is not persuaded by defendants' claim that granting next friend standing here would cause courts to be "inundated with lawsuits brought by advocates for persons living overseas in war-torn or developing countries." (Defs.' Reply Br. at 5.)  If such lawsuits arise, any "risk" is mitigated by the courts' ability to swiftly dismiss for lack of standing.  No slippery slope is likely to result from this Court's decision, which holds only that a close family relative, who has advocated on plaintiffs' behalf for years, is able to survive a motion to dismiss the claims of plaintiffs who cannot access the courts due to financial hardship, familial responsibilities, an ongoing civil war, and a remote location that makes communication either "sporadic and difficult" or "nearly impossible."

### III. POLITICAL QUESTION DOCTRINE

Defendants next argue that the Court lacks jurisdiction to hear plaintiffs' claims because they present non-justiciable political questions, which would require the Court to second-guess the Executive's policy determinations in matters that fall outside of judicial capabilities. (*See* Defs.' Mot. to Dismiss at 11-18.) Plaintiffs respond that they seek nothing more than a determination that the alleged drone strike violated domestic and international law, which courts are both well-equipped and constitutionally required to decide. (*See* Pls.' Opp'n Br. at 25-36.) Although plaintiffs' argument may have some intuitive appeal, their claims are squarely foreclosed by D.C. Circuit precedent, and therefore, the Court must dismiss them.

The political question doctrine prevents courts from passing judgment on policy choices and value determinations that are "by their nature committed to the political branches to the exclusion of the judiciary." *Schneider v. Kissinger*, 412 F.3d 190, 193 (D.C. Cir. 2005) (internal quotations omitted). Unsurprisingly then, the doctrine is "primarily a function of the separation of powers," but it also rests on the relative capabilities of the judiciary and the political branches to make certain determinations. *See Baker v. Carr*, 369 U.S. 186, 210-11 (1962). One area in which courts have been particularly hesitant to tread is that of foreign affairs and national security. *See Gilligan v. Morgan*, 413 U.S. 1, 10-11 (1973) ("It would be difficult to think of a clearer example of the type of governmental action that was intended by the Constitution to be left to the political branches . . . [than the] complex, subtle, and professional decisions as to the . . . control of a military force . . . ."); *Schneider*, 412 F.3d at 196 ("Unlike the executive, the judiciary has no covert agents, no intelligence sources, and no policy advisors. The courts are therefore ill-suited to displace the political branches in such decision-making."). This is not to say that any decision that has some "vague impact" on foreign affairs constitutes a political

9

question, *see Bancoult v. McNamara*, 445 F.3d 427, 435 (D.C. Cir. 2006), but the Court "must conduct a discriminating analysis of the particular question posed in the specific case before [it]." *See El-Shifa Pharm. Indus. Co. v. United States*, 607 F.3d 836, 841 (D.C. Cir. 2010) (en banc) (internal quotations omitted). If plaintiffs' claims, "*regardless of how they are styled*, call into question the prudence of the political branches in matters of foreign policy or national security," then they must be dismissed. *See id.* at 842 (emphasis added).[4]

The well-established framework for determining political questions was laid out in *Baker*:

> Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

---

[4] The political question doctrine ordinarily does not apply "when the Executive Branch itself [has] disclaimed the conduct and concluded that the official acted *outside* the scope of employment." *See Harbury v. Hayden*, 522 F.3d 413, 421 n.3 (D.C. Cir. 2008). Here, the Attorney General has certified that, "at the time of the conduct alleged in plaintiffs' complaint, defendants were acting within the scope of their employment." (*See* Def.'s Notice of Substitution [ECF No. 10] ¶¶ 3-4.) Although the certification expressly references only the named defendants, the Court reads it to implicitly reach the Doe defendants for purposes of the political question doctrine. *See Taylor v. Clark*, 821 F. Supp. 2d 370, 372-74 (D.D.C. 2011) (court substitutes United States as "sole party defendant" for both named and Doe defendants before dismissing case for lack of jurisdiction); *Taylor v. Clark*, Certification [ECF No. 1-1], Case No. 11-cv-1071 (RBW) (D.D.C. June 9, 2011) (Westfall Act certification references only the named defendant). First, the Doe defendants have not yet been served in this matter, so it would have been premature for the government to make any certification or substitution with regard to them. Next, plaintiffs' own complaint implicitly alleges that the Doe defendants were acting within the scope of their employment. (*See* Compl. ¶¶ 39-41 (challenged acts of Doe defendants were undertaken as part of their "job function[s]").) Finally, it would render the political question doctrine toothless to protect only policy makers, while allowing suits to go forward against those who carry out that policy.

369 U.S. at 217. "To find a political question, [the Court] need only conclude that one [*Baker*] factor is present, not all." *Schneider*, 412 F.3d at 194. As noted, these factors have been consistently found in numerous decisions of the D.C. Circuit, and there is no "remotely plausible basis to distinguish" those decisions from the claims asserted by plaintiffs. *See Harbury*, 522 F.3d at 421.

Most recently, the *El-Shifa* Court found that it lacked judicially manageable standards to determine whether a U.S. missile strike in Sudan was "mistaken and not justified" and therefore violated international takings law. *See* 607 F.3d at 845. To decide that question, the Court would need to "fashion[] out of whole cloth some standard for when military action is justified," which it declined to do. *See id.* By the same token, plaintiffs' claims here would require the Court to create a standard for assessing a foreign threat's "imminence, the feasibility of capture, [and the] proportionality [of the government's response]" (*see* Pls.' Opp'n Br. at 26), determinations for which the Executive is far better suited. *See Schneider*, 412 F.3d at 196; *see also Al-Aulaqi*, 727 F. Supp. 2d at 46 (determining "whether there are 'means short of lethal force' that the United States could 'reasonably' employ to address any threat that Anwar Al–Aulaqi poses" presents a "complex policy question[]"). What conceivable basis would the Court have for delineating the point at which the three young men presented an "imminent" threat to the U.S., such that it could confidently second-guess the Executive? When would their capture have been "feasible"—when there was a 51% chance that the operation would succeed, without any risk of harm to U.S. or Yemeni forces? Or a 75% chance that the operation would succeed, with a 50% risk of harm to U.S. or Yemeni forces? Should the Court assume that the local Yemeni forces were trustworthy allies, or should it factor in some risk that they might have colluded with the young men? And how could these odds even be calculated by the Court in the

first place? These are precisely the type of "complex policy questions" that courts are ill-equipped to answer. *See Al-Aulaqi*, 727 F. Supp. 2d at 46.

The *El-Shifa* Court also found the third *Baker* factor implicated by plaintiffs' claims, because "the decision to take military action is a 'policy determination of a kind clearly for nonjudicial discretion.'" *See* 607 F.3d at 845 (quoting *Baker*, 369 U.S. at 217). Again, there is simply no way to meaningfully distinguish plaintiffs' claims here, which—no matter how they are characterized—unquestionably challenge the decision to take military action in Khashamir. (*See* Pls.' Opp'n Br. at 27 (plaintiffs "challenge the extrajudicial execution of a non-combatant outside a war zone").) Plaintiffs weakly assert that *El-Shifa* is distinguishable because "plaintiffs failed to establish that the destruction of property was prohibited by a *jus cogens* norm or a violation of a U.S. statute" (*id.* at 27-28), but that presents a skewed reading of the case. *See* 607 F.3d at 846 ("In refusing to declare the El–Shifa attack 'mistaken and not justified,' we do not mean to imply that the contrary is true. We simply decline to answer a question outside the scope of our authority.").[5]

Standing alone, *El-Shifa* would be fatal to plaintiffs' claims, but that decision also rests on a line of recent Circuit cases that have reached the same result. In *Schneider*, the Court found that even "[a]bsent precedent, there could still be no doubt that decision-making in the fields of foreign policy and national security is textually committed to the political branches of government." 412 F.3d at 194 (political question where plaintiffs brought tort claims against U.S. officials over their covert support for a coup d'etat in Chile); *see also Gonzalez-Vera v.*

---

[5] Although Judge Kavanaugh would have dismissed the claims as frivolous because plaintiffs failed to identify any violation of an "established norm of customary international law," his opinion did not command a majority. *See El-Shifa*, 607 F.3d at 855 (Kavanaugh, J., concurring in the judgment).

12

*Kissinger*, 449 F.3d 1260, 1263 (D.C. Cir. 2006) (same). In *Bancoult*, the Court was unwilling to "second-guess the degree to which the executive was willing to burden itself by protecting" those who might be harmed by its foreign policy decisions. *See* 445 F.3d at 437 (political question where plaintiffs brought tort claims against U.S. officials for their allegedly improper treatment of native population during establishment of a military base in the Indian Ocean). Finally, the Court in *Harbury* found that plaintiffs' tort claims would "impermissibly require examining the wisdom of the [Executive's] underlying policies" in Guatemala in the 1990s. *See* 522 F.3d at 420 (finding political question where plaintiff brought tort claims against CIA officials over the alleged torture and execution of a Guatemalan rebel leader).

Plaintiffs argue that determining whether "the Executive violated laws of war, the TVPA, and ATS present the sort of 'purely legal issues' over which this Court unquestionably has jurisdiction." (Pls.' Opp'n Br. at 28.) The Court disagrees that this case presents *any* "purely legal issues," such as whether a statute is unconstitutional on its face, *see Zivotofsky ex rel. Zivotofsky v. Clinton*, 132 S. Ct. 1421, 1427 (2012), or whether a statute imposes a mandatory obligation on an agency, *see Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 241 (1986). Instead, plaintiffs seek a judicial determination that a particular action by the Executive violated domestic and international law, *i.e.*, a quintessential mixed question of law and fact. *See, e.g.*, *Barbour v. Browner*, 181 F.3d 1342, 1345 (D.C. Cir. 1999) (mixed questions of law and fact "require the application of a broad legal standard to particular facts").

Plaintiffs cite two cases within this Circuit in which tort claims arising from foreign policy decisions were found justiciable. *See Comm. of U.S. Citizens Living in Nicar. v. Reagan*, 859 F.2d 929 (D.C. Cir. 1988) (funding of Nicaraguan Contras); *Al-Aulaqi v. Panetta*, 35 F. Supp. 3d 56 (D.D.C. 2014) (drone strike resulting in death of Anwar Al-Aulaqi). However, in

each of those cases, plaintiffs raised constitutional claims. *See Comm. of U.S. Citizens*, 859 F.2d at 935; *Al-Aulaqi*, 35 F. Supp. 3d at 69-70 (distinguishing *El-Shifa* because Al-Aulaqi's U.S. citizenship gave rise to constitutional rights). Because the judiciary is the ultimate interpreter of the Constitution, constitutional claims can require a court to decide what would otherwise be a political question, *see El-Shifa*, 607 F.3d at 841-42, but no such claims have been made here. That leaves only Judge Weinstein's thoughtful opinion in *In re Agent Orange Product Liability Litigation*, which found claims that were not materially distinguishable from plaintiffs' to be justiciable. *See* 373 F. Supp. 2d 7, 75 (E.D.N.Y. 2005). But, of course, this Court is bound by the decisions of the D.C. Circuit, not the Eastern District of New York.

Plaintiffs also argue that they challenge "the violation of a domestic statute and universally agreed upon, non-derogable norms governing the use of force, *not* the wisdom of a discretionary decision committed to the Executive." (Pls.' Opp'n Br. at 26.) In other words, they claim it is permissible for them to attack an action of the Executive, as opposed to a policy choice. Similar arguments have been made and rejected countless times, because a policy cannot be viewed in isolation from the actions taken in support of it. *See Bancoult*, 445 F.3d at 437 ("[T]he specific steps taken to establish the [military] base did not merely touch on foreign policy, but rather constituted foreign policy decisions themselves."); *Harbury*, 522 F.3d at 420-21 ("[A]lthough the plaintiffs in all three cases argued that they challenged specific acts and not general Executive Branch foreign policy decisions, this Court reasoned that the cases sought [impermissible] determinations whether the alleged conduct *should* have occurred . . . .").

Finally, plaintiffs assert that the Court's holding adopts a "radical position that would bar judicial review of the most heinous war crimes." (*See* Pls.' Opp'n Br. at 25.) That is not entirely true. As discussed, the political question doctrine does not ordinarily prevent the resolution of

constitutional claims. *See El-Shifa*, 607 F.3d at 841-42. Furthermore, it only applies when the challenged conduct occurs within the scope of official duties, *see supra* n.4, and it is unlikely that "the most heinous war crimes" would qualify as such. However, to the extent that these hypothetical war crimes do result from a deliberate policy decision of the Executive, the courts' inability to review that decision "underlies our entire constitutional system." *See Gilligan*, 413 U.S. at 10 ("The ultimate responsibility for these decisions is appropriately vested in branches of the government which are periodically subject to electoral accountability."); *Schneider*, 412 F.3d at 193 (limit on courts' political question jurisdiction "is as old as the fundamental principle of judicial review"). Plaintiffs may reasonably question whether this doctrine has been applied too deferentially to the executive branch, *see El-Shifa*, 607 F.3d at 851 (Ginsburg, J., concurring in the judgment), but they cannot reasonably dispute that this Court's decision is squarely controlled by a long line of binding precedent.[6]

## CONCLUSION

For the reasons stated, defendants' motion to dismiss will be **GRANTED**. A separate order accompanies this Memorandum Opinion.

/s/
ELLEN SEGAL HUVELLE
United States District Judge

Date: February 22, 2016

---

[6] And even if that were not the case, plaintiffs' claims would still face insurmountable barriers on the merits. *See, e.g.*, *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983) (previous exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief); *Haase v. Sessions*, 835 F.2d 902, 911 (D.C. Cir. 1987) (*Lyons* rationale equally applicable to claims for declaratory relief); *Saleh v. Titan Corp.*, 580 F.3d 1, 16 (D.C. Cir. 2009) (TVPA does not authorize suits against U.S. officials).